Edward **BONTKOWSKI**,
Petitioner–Appellant,

v.

**UNITED STATES of America**,
Respondent–Appellee.

**Nos. 86–1871, 86–1908.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 21, 1987.

Decided June 24, 1988.

Rehearing and Rehearing En Banc Denied July 19, 1988.

---

Suzanne Philbrick, Oak Lawn, Ill., for petitioner-appellant.

Stephen Crocker, Asst. U.S. Atty., Anton R. Valukas, U.S. Atty., Chicago, Ill., for respondent-appellee.

Before CUDAHY, POSNER, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Petitioner-appellant, Edward Bontkowski, appeals the district court's dismissal of his two petitions filed pursuant to 28 U.S.C. § 2255.[1] Bontkowski sought to vacate his

---

1. Both appeals have been consolidated for review. Cause No. 86–1871 concerns a bank fraud case (district court Cause No. 85 C 8201 (84 CR 345)). Cause No. 86–1908 relates to a cocaine case (district court Cause No. 85 C 8202 (84 CR 598)).

convictions based on guilty pleas to two separate and unrelated indictments—one charging him with conspiracy to distribute and distribution of cocaine and a second charging him with aiding and abetting in the misapplication of bank funds. Bontkowski claims his conviction of the cocaine charge should have been vacated because the court incorrectly sentenced him. He also contends his conviction of the bank fund misapplication charge should have been vacated because the plea, on which it was based, was not voluntary and because the court had an insufficient factual basis for accepting it.

We agree with the district court that Bontkowski's § 2255 petition was properly dismissed with respect to the cocaine charge and we agree that Bontkowski's failure to raise certain claims regarding the bank fraud charge resulted in a waiver of those claims. However, we also find that Bontkowski's § 2255 petition, with respect to the claim that his plea to the bank fraud charge was based on insufficient facts, should be remanded for review by the district court in light of our recent decision in a related case.

## I.

In the spring of 1984, Bontkowski and seven co-defendants were named in a twenty-five count indictment. They were charged with transporting stolen property, aiding and abetting in the misapplication of bank funds, and making false statements to a bank. This case was assigned to Judge Paul Plunkett. Later that summer, Bontkowski and Elena Vavadakis (whom Bontkowski later married) were indicted by a separate grand jury for multiple counts of cocaine distribution, conspiracy, and extortion. This case was assigned to Judge George Leighton.

Separate plea agreements were negotiated in each case. The cocaine case was transferred to Judge Plunkett so that pleas in both cases could be accepted by the same judge.

Bontkowski pled guilty to the two counts of the bank fraud indictment which charged him with aiding and abetting in the misapplication of bank funds. As to this indictment, he was sentenced to four years imprisonment for each count, with the sentences to be served concurrently.

At the time Bontkowski pled guilty to the bank fraud charges, he also pled guilty to two counts, in the unrelated drug indictment, of conspiring to distribute cocaine and to distributing cocaine. With regard to the drug indictment, Bontkowski was sentenced to four years imprisonment followed by a five year period of probation and a special parole term of three years. The sentence imposed in the drug indictment was concurrent to the sentence imposed under the bank fraud indictment.

Because the facts leading to the acceptance of the guilty pleas to the various charges are pertinent to Bontkowski's § 2255 petitions, we will set them out in some detail.

## A.

As we described in the related case involving one of Bontkowski's co-defendants,[2] Bontkowski and several others, including Ronald Berkovitz and William Giova, were charged with defrauding a federal bank. Berkovitz allegedly masterminded the conspiracy which involved duping small business operators into obtaining loans for him from Giova and the First National Bank of Cicero.

According to Bontkowski, Berkovitz approached him with a plan whereby Bontkowski could obtain quick financing for his trucking company and some additional, much-needed cash. All Bontkowski had to do was to approach Giova, an officer at the Cicero bank, and apply for a loan. Berkovitz would then receive a portion of Bontkowski's loan proceeds presumably to invest in Berkovitz's get-rich-quick enterprise.

Bontkowski contends that unbeknownst to him, Berkovitz and Giova already had a prior history of engaging in loan transac-

---

**2.** *United States v. Bruun,* 809 F.2d 397 (7th Cir.    1987).

tions. Dealing with Giova, Berkovitz had borrowed money directly from and brokered loans for the Cicero bank. With regard to the brokered loans, Berkovitz referred a series of large (but usually high risk) borrowers to the Cicero Bank. Giova then approved these brokered loans. When these loans proved to be a serious liability to the bank, the bank board ordered Giova to stop accepting loans brokered by Berkovitz. Moreover, under federal lending limit laws, Giova was no longer permitted to make direct loans to Berkovitz. Ever resourceful, Berkovitz sought out small business owners who were in a financial pinch, and encouraged them to apply directly to Giova for loans. A portion of the loans then went to Berkovitz, a fact of which Giova and the borrowers were allegedly aware but the bank management was not. Thus, Berkovitz continued to receive a portion of loans, the Cicero Bank, in effect, was still accepting brokered loans, and Giova continued to make loans to Berkovitz in violation of federal lending limits.

Of specific relevance here, Berkovitz called Giova and told him that he had provided Bontkowski with bearer bonds which Bontkowski was going to use as collateral to obtain two loans from Giova. One loan was for $370,000.00, the other for $100,-000.00. Unfortunately, the bonds Bontkowski used as collateral were stolen. Bontkowski purportedly did not know the bonds were stolen. However, Bontkowski was aware, as he admitted at the time of his plea, that a portion of his loans was to go to Berkovitz.

When the Berkovitz–Giova scheme was uncovered, Bontkowski was charged with one count of aiding and abetting in the misapplication of bank funds for each loan for which he had signed.

Bontkowski pled guilty to the two counts of the indictment, admitting that when he applied for the two loans, he knew that a portion of the proceeds were to go to Berkovitz. At the time of the plea, the government's evidence as to Bontkowski's participation in the loan scheme was presented as follows:

[AUSA]: Judge, it is charged in Counts 10 and 11 of the indictment that on February 26, 1982 Mr. Bontkowski obtained two loans at the First National Bank of Cicero, one for $370,000.00, the other for $100,000.00. The government's evidence would show first that the deposits of that bank are insured by the Federal Deposit Insurance Corporation and were insured at the time he obtained the loans.

The government's evidence would also show that the collateral for those loans was $495,000.00 worth of bearer bonds *which Mr. Bontkowski didn't own and which in fact had been stolen in New York City and transported to Chicago by Clarence Wade, a co-defendant.*

The government's evidence would also show that the *defendant was only a partial beneficiary* of the loan proceeds and that in fact most of the money went to Ronald Berkowitz [sic], another co-defendant. By signing numerous checks, cashing checks and turning the money over to Mr. Berkowitz [sic], and by further concealing from the bank through its records, and *not disclosing the existence of Mr. Berkowitz* [sic] *and the fact he was a beneficiary of the loan, other than to Mr. Giova, who is a co-defendant, the defendant aided and abetted Mr. Giova in misapplying the bank funds.* (Emphasis added.)

Notably absent from the government's summary was any evidence that Bontkowski knew the bearer bonds he used to obtain the loans, were stolen. This omission, as we shall see, was a crucial one.

After the government presented its evidence, the court questioned Bontkowski to further establish the basis for his plea.

THE COURT: Is it in fact your statement to me today by your plea that you did work with Mr. Berkowitz [sic] and others to obtain money from the First National Bank of Cicero?

THE DEFENDANT: Yes, I did, your Honor.

THE COURT: And that you knew in the course of what you were doing that you were in fact injuring and defrauding the First National Bank of Cicero?

THE DEFENDANT: In a legal sense, your Honor.

THE COURT: Well, you have to tell me what you mean then, Mr. Bontkowski.

THE DEFENDANT: I knew that I wasn't the benefactor in these loans, *but it was never my intention to defraud this bank.*

THE COURT: *Well, then we may have a problem,* Mr. Pearl [AUSA] *we have charged him with intent to* —not "we," the *government has charged him with intent to injure and defraud the bank.*

[AUSA]: I think Mr. Bontkowski, if we could clarify, perhaps would admit that he had no intent to injure the bank in the sense that most people would have—he would have wished that this whole thing worked out and no one lost a penny; *but I think he would agree that he intended to defraud the bank in the sense that he never revealed, and willfully failed to reveal, that Mr. Berkowitz* [sic] *was a recipient of the proceeds and did in fact represent himself as the sole beneficiary of the loan.*

[DEFENDANT'S ATTORNEY]: That is what I was about to say, Judge.

THE COURT: All right.

THE DEFENDANT: That's what I meant, your Honor.

THE COURT: Okay.

THE DEFENDANT: I don't know how to explain myself.

THE COURT: All right. Well, you're doing all right. So you are telling me you knew at the time these loans were given that they were given at least in part in your name, is that right?

THE DEFENDANT: The entire loan was given in my name.

THE COURT: I see, and at the time you knew you weren't going to get those funds?

THE DEFENDANT: That's correct, your Honor.

THE COURT: And you knew you were going to give them to somebody named Berkowitz [sic]?

THE DEFENDANT: Correct, your Honor.

THE COURT: And you did not tell the bank that?

THE DEFENDANT: Only Bill Giova, the banker in this.

THE COURT: I see, and you understood that Bill Giova was a part of this agreement to get money from the bank?

THE DEFENDANT: Correct, your Honor.

THE COURT: All right. So you are satisfied, Mr. Bontkowski, that you are in fact guilty of the crimes charged in Counts 10 and 11 of this indictment?

THE DEFENDANT: I am, your Honor. (Emphasis added.)

Based on this colloquy, the court accepted Bontkowski's guilty plea to the aiding and abetting charges. He received a four year sentence on each count, with the sentences to be served concurrently.

### B.

As indicated earlier, at the time Bontkowski pled guilty to the bank fraud charges, he also pled guilty to two other counts arising from an unrelated drug indictment involving a conspiracy and distribution of cocaine. At the plea proceeding, the government indicated that it was prepared to prove that Bontkowski had entered into a series of transactions and conversations involving cocaine and that he ultimately sold approximately 200 grams of cocaine to an FBI agent. Bontkowski, who was hard-pressed to dispute the evidence, agreed to plead guilty. At the time the court discussed the plea with Bontkowski, the court asked:

THE COURT: Mr. Bontkowski, do you understand that if I accept your plea of guilty to this indictment 84 CR 598 that you give me the power to sentence you to up to 30 years in a federal prison, fine you up to $50,000.00 and require a parole term no less than three years and up to the rest of your life?

Bontkowski answered:

THE DEFENDANT: Yes I do, your Honor.

Subsequently, the court orally announced the imposition of a sentence of four years

for one count to be followed by five years probation for the second count. At the time it imposed the sentence, the court did not make reference to the special mandatory parole term it had previously discussed with Bontkowski. However, the court did add the three year special parole term in its written judgment and commitment order issued later.

## II.

Shortly after Bontkowski was sentenced, he filed a motion to reduce his sentence pursuant to Fed.R.Crim.P. 35. The Rule 35 motion addressed both the sentence in the bank fraud indictment as well as the drug indictment and focused exclusively on a request for leniency. The court conducted a lengthy hearing on the motion and considered arguments with respect to both sentences. The court determined that the matters presented at the Rule 35 hearing did not affect the imposition of either sentence. Consequently, the court denied Bontkowski's Rule 35 motion.

## III.

Without filing appeals from the guilty plea convictions or from the denial of the Rule 35 motion, Bontkowski filed separate § 2255 petitions based on claims arising out of the guilty plea in each indictment.

In his petition relating to the cocaine charges, Bontkowski set forth a panoply of claims. He alleged his plea to the charges was not voluntary and should have been vacated because of: (1) prosecutorial misconduct; (2) the denial of the right to his choice of counsel at the time of his arrest; (3) the denial of reasonable bail; (4) the involuntariness of his plea; (5) the inaccuracy of the presentence report used to sentence him; (6) the denial of his fourth amendment rights; (7) the imposition of an illegal special parole term; and finally, (8) the ineffective assistance of counsel.

With respect to the plea arising from the bank fraud charges, Bontkowski alleged that his plea violated Fed.R.Crim.P. 11(f) in that there was an insufficient factual basis to support the plea. Bontkowski also claimed that: (1) the counts to which he pled were multiplicitous; (2) that the bonds he used as collateral were not stolen; (3) that government used perjured testimony to obtain his plea; (4) that his plea was the result of the government's outrageous conduct; (5) that he received ineffective assistance of counsel at the time of his plea; and (6) that the presentence report used to fashion the sentence to these charges contained inaccuracies.

In response to both § 2255 petitions, the government argued that Bontkowski had failed to raise these claims either by way of a direct appeal from his convictions or in his Rule 35 motion. Moreover, the government argued that Bontkowski failed to explain why he did not raise any of these claims during the original plea proceedings. Absent an explanation, or "cause," for this failure and a resulting prejudicial effect to the defendant, the government argued that Bontkowski was not entitled to raise his claims for the first time in his § 2255 petitions.

The district court ordered Bontkowski to address the "cause and prejudice" issues in a brief. In response to the court's order, Bontkowski filed an affidavit alleging that he pled guilty to the cocaine charges because the FBI threatened his pregnant wife. Further, had he not been forced to plead to the cocaine charges, Bontkowski claimed he would not have pled to the bank fraud charges. Bontkowski then stated that he did not mention the threats in his Rule 35 proceeding because he felt his wife was in danger. Finally, Bontkowski claimed he thought the appropriate means of attacking a coerced plea was to file a § 2255 petition.

In an apparently consolidated order, the district court denied both of Bontkowski's § 2255 petitions indicating that Bontkowski had not demonstrated "good cause" for his failure to raise those claims on appeal or in his Rule 35 motion. The court found that Bontkowski's failure to raise the contentions contained in his petitions, either in his Rule 35 motion or on a direct appeal from his convictions under Appellate Rule 4(b), constituted a waiver of those claims. The

court noted that when the pleas were taken, Bontkowski was asked under oath whether he had been threatened in any manner. He unequivocally answered no. The court concluded that the "threats to Bontkowski's wife were not cause for Bontkowski's procedural default." The court stated that the government's alleged threat "to proceed with a separate prosecution" against Bontkowski's wife if Bontkowski did not plead guilty to these indictments "is a permissible form of plea bargaining."

## IV.

On appeal, Bontkowski has abandoned most of the claims originally made in his § 2255 petitions filed with the district court. Now, with respect to his conviction of the cocaine charges, Bontkowski argues only that his sentence should not have been amended to include a special parole term without affording him a hearing. Further, with regard to the bank fraud charges, Bontkowski now argues first, that there was an insufficient factual basis for his plea to those charges; second, that his plea was the result of coercion; and third, that his other claims should not have been deemed waived.

■ Since Bontkowski's argument relating to the after-the-fact imposition of the special parole term may be disposed of easily, we will review it first. The permissibility of amending a sentence to include a mandatory special parole term was addressed in *United States v. Connolly,* 618 F.2d 553 (9th Cir.1980). In *Connolly,* the petitioner filed a § 2255 petition requesting relief from a court order amending his sentence to include a mandatory parole term. The petitioner argued that the amendment of his sentence constituted a resentencing or a *de novo* proceeding, requiring his presence. In ruling on these claims, the Ninth Circuit initially noted that an error of law, such as the imposition of an incorrect sentence, "does not provide a basis for collateral attack unless the claimed error constituted a 'fundamental defect which inher-

ently results in a miscarriage of justice'....", 618 F.2d at 555, *United States v. Addonizio,* 442 U.S. 178, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979), quoting, *Hill v. United States,* 368 U.S. 424, 82 S.Ct. 468. The court concluded that the failure to impose a mandatory parole term did not constitute a "miscarriage of justice."

As to the cocaine charges brought against Bontkowski, Title 21 U.S.C. § 841(b)(1)(C), required the imposition of a mandatory special parole term. The failure to impose the special parole term was an error which rendered Bontkowski's sentence illegal. Certainly, an erroneous sentence should be corrected as soon as possible after the error is discovered. To that end, Rule 35(a) permits a judge to correct an illegal sentence at any time. We concur with the *Connolly* decision.[3] A defendant is not prejudiced by the correction of an illegal sentence which adds a minimum special parole term.

Moreover, the defendant's presence is not required to correct an illegal sentence. Nothing the defendant could say would aid the court in modifying a sentence to conform to mandatory statutory requirements.

Thus, contrary to Bontkowski's assertions, modification of a sentence to include a mandatory special parole term does not provide a basis for a collateral attack. It is inappropriate to utilize § 2255 to review a district court's order correcting an illegal sentence under Rule 35(a). The district court's dismissal of Bontkowski's petition for habeas corpus, as to the guilty plea arising from cocaine transactions, was therefore proper.

We also find that the district court correctly dismissed all but one of Bontkowski's claims in the bank fraud case on the grounds of waiver. This court recently reaffirmed the principle that "a petition under § 2255 'will not be allowed to do service for an appeal.'" *Johnson v. United States,* 838 F.2d 201, 202 (7th Cir.1988), *quoting Sunal v. Large,* 332 U.S. 174, 178,

---

**3.** The Eleventh Circuit Court of Appeals has also followed *Connolly* in *United States v. Adair,* 826

F.2d 1040, 1041 (11th Cir.1987).

67 S.Ct. 1588, 1590, 91 L.Ed. 1982 (1947). In *Williams v. United States,* 805 F.2d 1301, 1306–07 (7th Cir.1986) this court explained:

[B]ecause defendants who plead guilty have an opportunity to challenge their sentences directly and in Rule 35 proceedings, we hold that the *Norris [v. United States,* 687 F.2d 899 (7th Cir. 1982)] cause and prejudice standard is applicable when these defendants attack their sentences by raising new issues for the first time in a section 2255 proceeding.

Under *Norris,* Bontkowski is barred from raising any constitutional issues in a § 2255 proceeding which he could have raised on direct appeal of his convictions through a Fed.R.App.P. 4(b) motion, or in a Rule 35 motion, *absent* a showing of cause and prejudice.[4] Moreover, non-constitutional errors which could have been raised on appeal but were not, are barred on collateral review—regardless of cause and prejudice. *Kaufman v. United States,* 394 U.S. 217, 89 S.Ct. 1068, 22 L.Ed.2d 227 (1969).

The government is correct in its assertion that Bontkowski has failed to show cause for his procedural defaults. When the district court directed Bontkowski to explain why he failed to raise the claims contained in his habeas petitions on direct appeal or at the Rule 35 proceeding, Bontkowski alleged he had been threatened.

According to Bontkowski, if he had not pled guilty to charges contained in both indictments, the government would have gone forward with its prosecution and incarceration of his pregnant wife. There was no reference in the plea agreement conditioning the disposition of his wife's case on Bontkowski's guilty plea.[5] Even if the allegations of such plea bargaining pressure were true, it would not have been improper for the government to negotiate the disposition of both cases on the basis of Bontkowski's plea. A guilty plea is not constitutionally involuntary simply because it is the end result of the plea bargaining process. *Bordenkircher v. Hayes,* 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (1978). Bontkowski's wife had already been indicted and any threat that she would be prosecuted to the fullest extent possible cannot support a claim of coercion. *United States v. Diaz,* 733 F.2d 371 (5th Cir.1984); *United States v. Usher,* 703 F.2d 956 (6th Cir.1983).

Returning to the facts in the guilty pleas in both cases, Bontkowski was asked whether his pleas had been coerced by threats or obtained by promises outside the plea agreements. The record of those pleas disclose the following with regard to the cocaine case:

THE COURT: All right. You tell me in here, Mr. Bontkowski, that you acknowledge that no threats have been made against you to cause you to plead guilty, is that right?

THE DEFENDANT: Yes, your Honor.

THE COURT: Are you telling me by that statement, Mr. Bontkowski, that no one from the federal government or any other person has made any kind of a threat against you which in any way has contributed to your coming in here today and seeking to plead guilty?

THE DEFENDANT: No one has threatened me, your Honor.

THE COURT: All right. You also tell me that there are no promises or representations made to you or agreements reached other than those contained in this plea agreement, is that right?

THE DEFENDANT: That's correct. No.

With regard to the bank fraud case the court inquired as follows:

THE COURT: You also tell me, Mr. Bontkowski, that there have been no threats, promises or agreements other

---

**4.** On appeal, Bontkowski alleged the *Norris* "cause and prejudice" standard should not have been applied to determine whether he waived his habeas claims. However, that issue was settled in *Williams v. United States, supra,* and we will not address that issue again.

**5.** She was, in fact, ultimately convicted and given a sentence of probation.

than this one that have induced you to plead guilty in this case, that is, the Giova–Berkowitz [sic] case, right?

THE DEFENDANT: Correct, your Honor.

THE COURT: So you are telling me that no one, no human being, has ever made a threat against you that has caused you to plead guilty?

THE DEFENDANT: No one's made me any threats or promises.

Thus, after having observed Bontkowski in the plea proceedings (and at the Rule 35 hearing), the district court correctly found Bontkowski was bound by his answers given under oath at the plea proceedings. *United States v. Ellison,* 835 F.2d 687 (7th Cir.1987). In *Ellison,* we said, "[t]o ensure a plea is voluntary and that a later motion to withdraw the plea will not become necessary, Fed.R.Crim.P. 11(d) requires that the 'trial judge ask the defendant specific questions concerning the voluntariness of the plea agreement.'" Further, "[t]he whole point of the plea proceeding (the Rule 11 colloquy) is to establish that the plea was knowingly and voluntarily made." Finally, and more to the point for purposes of this opinion, "[r]ational conduct requires that voluntary responses made by a defendant under oath before an examining judge be binding."

In sum, Bontkowski's allegations of a government threat to incarcerate his wife for a crime with which she had been charged, did not raise a constitutional issue of lack of voluntariness regarding his guilty pleas. His responses at the plea proceedings were voluntary and binding. The district court's finding that Bontkowski failed to show cause for his procedural defaults in failing to challenge his convictions on appeal or at his Rule 35 hearing was correct with regard to all but one issue.

In his § 2255 petition concerning the bank fraud case, Bontkowski did raise one claim which may not have been waived. Bontkowski claimed that this court's ruling in *United States v. Bruun,* 809 F.2d 397 (7th Cir.1987), involving an appeal by codefendant Bruun, established that the type of evidence presented by the government and accepted by the court as the basis for Bontkowski's plea to the bank fraud charges, is insufficient. In *Bruun,* we held that intent, requiring proof of knowledge, is a necessary element of the offense to which Bontkowski pled guilty. Bontkowski argues there was no evidence that he intended to defraud the Cicero bank when he signed for the two loans since he did not know the bonds he used as collateral were stolen. Therefore, because the government failed to prove his knowledge that the bonds were stolen, Bontkowski argues that the district court should not have accepted his guilty plea.

In *Bruun,* we held that evidence that a defendant applied and obtained loans for an undisclosed third party (Berkovitz) was not sufficient to convict the defendant of aiding and abetting in the misapplication of bank funds. We said:

> To be liable as an aider and abetter, Bruun must have shared Giova's criminal intent [citations omitted]....
>
> ... [t]here was no evidence that *Bruun knew that the securities were stolen.* Thus, he believed that they were the property of Berkovitz and he had been given authority to pledge them. Additionally, there was no evidence that he was aware of FNBC's unwillingness to deal with Berkovitz.

809 F.2d at 411 (emphasis added). Finally "[b]ecause his acts would have been entirely innocent had the facts been as he supposed them to be, [defendant] lacked the shared criminal intent to convict him of aiding and abetting." *Id.* at 412.

Thus, *Bruun* for the first time set out the requirements for finding a defendant guilty of aiding and abetting in the misapplication of bank funds involving stolen collateral. No decision regarding the elements of this crime, under these circumstances, had previously been handed down.

Had *Bruun* been decided before Bontkowski pled guilty to the bank fraud charges, we would agree with the district court's ruling that Bontkowski's factual insufficiency claim, like the other claims raised in the bank fraud § 2255 petition,

was waived when Bontkowski failed to raise it on direct appeal. However, *Bruun* was decided after Bontkowski's plea had been accepted and after the period in which to appeal from the conviction had elapsed. In fact, *Bruun* was not decided until eight months after Judge Plunkett had already dismissed Bontkowski's § 2255 petitions.

Thus, Bontkowski is really asking this court to retroactively apply the *Bruun* holding to this case. Normally, "courts apply a new rule retroactively in cases still pending on direct review [if those cases meet certain other requirements], whereas cases on collateral review ordinarily would be considered in light of the rule as it stood when the conviction became final." *Hankerson v. North Carolina,* 432 U.S. 233, 248, 97 S.Ct. 2339, 2348, 53 L.Ed.2d 306 (1977) (J. Powell *concurring*). But, where the new law affects a right which is "implicit in the concept of ordered liberty," retroactive application of new case law pending on collateral review is appropriate. *Williams v. United States,* 401 U.S. 667, 91 S.Ct. 1171, 28 L.Ed.2d 404 (1971) (Harlan, J., concurring in part and dissenting in part).

Absent a waiver, a defendant's right to due process is violated where that defendant is convicted of an offense without sufficient evidence of all the elements of that offense. The decision in *Bruun,* defining the elements of the offense of aiding and abetting in the misapplication of bank funds and describing the evidence needed to prove those elements, makes clear that the evidence introduced against Bontkowski was insufficient.

Aside from the fact that the *Bruun* decision describes a quantum of evidence needed to prove the crime with which Bontkowski was charged, retroactive application of the *Bruun* decision to Bontkowski's case may be warranted for another reason. Both Bontkowski and Bruun were charged in the same indictment. It would seem to be fundamentally unfair to treat similarly situated defendants differently where the difference in Bruun's and Bontkowski's cases is solely a matter of timing. Since the evidence against Bruun and Bontkow-

ski was substantially similar and we held that evidence was insufficient with respect to Bruun, we cannot now say it was sufficient with respect to Bontkowski simply because Bontkowski's conviction became final before *Bruun* was decided.

However, if, in fact, Bontkowski waived the issue of the government's failure to present a sufficient factual basis for his plea, the symmetry between the *Bruun* case and this case is destroyed and Bontkowski could be denied the relief afforded in *Bruun.* Therefore, the district judge must be given an opportunity to evaluate the difficult question of cause and prejudice with regard to waiver of the insufficient facts claim. A remand will enable the district court to apply the *Bruun* decision in determining whether there was cause and prejudice with regard to Bontkowski's failure to pursue a direct appeal on this issue.

### V.

In summary, we hold that the district court properly dismissed Bontkowski's § 2255 petition with respect to the cocaine case. As to Bontkowski's § 2255 petition in the bank fraud case, we hold that he waived all issues, save the factual insufficiency claim. The factual insufficiency claim must be remanded to the district court for review of the issue of waiver in light of the retroactive application of *Bruun.*

The decision of the district court with regard to the cocaine case is AFFIRMED. The decision of the district court with regard to the bank fraud case is AFFIRMED in part and REMANDED with instructions for review consistent with this opinion.

CUDAHY, Circuit Judge, concurring in part and dissenting in part:

I agree with the statement of the majority that it is "fundamentally unfair to treat similarly situated defendants differently where the difference in Bruun's and Bontkowski's cases is solely a matter of timing." This should end the matter, and Bontkowski's conviction for aiding and

abetting in the misapplication of bank funds should be vacated as was Bruun's. Instead the majority has remanded to the district court to determine whether Bontkowski may have waived the claim that he lacked the requisite intent by failing to raise it on direct appeal before *United States v. Bruun,* 809 F.2d 397 (7th Cir. 1987), was decided. This seems to me to place strained and hypertechnical considerations as obstacles in the path of correcting what is "fundamentally unfair." The case before us is a truly "special case" where I believe the interests of justice are genuinely implicated. *Cf. Murray v. Carrier,* 477 U.S. 478, 495, 106 S.Ct. 2639, 2650, 91 L.Ed. 2d 397 (1986) (" '[i]n appropriate cases', the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting fundamentally unjust incarceration' ") (quoting *Engle v. Isaac,* 456 U.S. 107, 135, 102 S.Ct. 1558, 1576, 71 L.Ed.2d 783 (1982)).

On another point, the majority rejects Bontkowski's claim that his guilty plea was involuntary. This court has held, most recently in *United States v. Ellison,* 835 F.2d 687 (7th Cir.1987), that defendants must be bound by voluntary responses made under oath in plea colloquies. *Blackledge v. Allison,* 431 U.S. 63, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977), cautions, however, that courts "cannot fairly adopt a *per se* rule excluding all possibility that a defendant's representations ... were so much the product of such factors as misunderstanding, duress, or misrepresentation by others as to make the guilty plea a constitutionally inadequate basis for imprisonment." *Id.* at 75, 97 S.Ct. at 1629–30. I do not think that Bontkowski's bare allegation that the prosecution threatened to seek stiffer penalties against his wife if he declined to plead guilty—an allegation unsupported by Bontkowski's representation in his original section 2255 petition attributing his failure to raise his objections on direct appeal to ineffective assistance of counsel—is sufficient to trigger a hearing on the question of voluntariness. *Cf. Key v. United States,* 806 F.2d 133, 139–40 (7th Cir.1986). But I think it is important to observe that "threats to prosecute third parties can carry leverage wholly unrelated to the validity of the underlying charge" and to stress that courts must be even more zealous than usual when they assess the voluntariness of plea bargains involving third party beneficiaries. *United States v. Nuckols,* 606 F.2d 566, 569 (5th Cir.1979).